IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LATRICE SAXON, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>Defendant. | Case No. 1:19-cv-403<br>Judge Robert M. Dow |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS OR STAY IN FAVOR OF ARBITRATION**

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, the Supreme Court's decision in *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612 (2018), and Fed. R. Civ. P. 12(b)(3), Plaintiff Latrice Saxon's ("Saxon") lawsuit must be dismissed or alternatively stayed pursuant to 9 U.S.C. § 3, because she agreed to individually arbitrate all wage and hour-related claims against Defendant Southwest Airlines Co. ("Southwest").

**PROCEDURAL HISTORY**

In July 2018, Saxon's counsel filed the exact same Fair Labor Standards Act ("FLSA") claim against Southwest on behalf of Ramp Agent Supervisors at Chicago Midway International Airport ("Midway"), seeking to represent the same collective group for purported unpaid overtime claims. *See Battles v. Southwest Airlines Co.*, Case No. 1:18-cv-04822, Dkt. 2 (N.D. Ill. July 13, 2018), at p. 5 (hereafter the "*Battles* action") (Ex. A hereto). The *Battles* action, which was pending before Judge Aspen, was voluntarily dismissed in favor of arbitration on the *agreed stipulation* of the parties, after Southwest brought this same motion pursuant to Fed. R. Civ. P. 12(b)(3) (*Battles* action, Dkt. 29, Ex. B hereto). Southwest's 12(b)(3) motion in the *Battles* action included sworn testimony that all of Southwest's Ramp Agent Supervisors,

including those based at Midway, annually agree to individually arbitrate wage and hour claims. (*Battles* action, Dkt. 14-1, p. 2, Ex. C hereto). Following dismissal of the *Battles* action, six Midway-based Ramp Agent Supervisors have submitted the exact same claims to individual arbitration in accordance with the individual arbitration agreements they entered into with Southwest. (Ex. D, Demands for Arbitration).

Without any justification, Saxon and the same counsel now seek to bring an identical FLSA collective action in this lawsuit, despite knowing full well that Saxon, like all other Midway-based Southwest Ramp Agent Supervisors, has signed a binding agreement to individually arbitrate any wage and hour claims. Saxon's claims are duplicative and harassing, and violate the terms of her signed agreements with Southwest. Saxon has no ability to raise these claims before this Court.

## BACKGOUND FACTS

Saxon, who contends that she is a supervisory employee who works as a Ramp Agent Supervisor for Southwest in Illinois (Dkt. 1 ¶¶ 8, 12), filed this lawsuit six months after the *Battles* action, purporting to assert the same unpaid overtime collective action claims under the FLSA. Saxon's FLSA claim—which is identical to the FLSA claims in the *Battles* action—is premised on assertions that Southwest failed to pay her and other Ramp Agent Supervisors for "all time worked prior to their regularly scheduled shifts and for work performed during unpaid meal breaks, thereby failing and refusing to pay them the overtime wage compensation required by law." (*Id.* at ¶ 35.) Southwest denies these assertions.

On an annual basis since 2015, Saxon and other Southwest supervisory employees at Midway have agreed to individually arbitrate wage and hour claims, "including claims related to unpaid wages or other compensation, hours worked, and breaks," by agreeing to and

electronically signing the Southwest Airlines Alternative Dispute Resolution Program (the "ADR Program"). (Ex. E, Declaration of Vincent Vasquez, ¶¶ 3, 5-8, Ex. 1, p. 2, Exs. 2, 3.) Indeed, in 2015, 2016, 2017, and again in October 2018, Saxon logged into Southwest's employee-facing intranet ("SWALife") using a secure, unique password she established, and completed the review and signature process, agreeing to comply with the ADR Program. (*Id.* at ¶¶ 5-9.) The ADR Program covers all Southwest employees not subject to a Collective Bargaining Agreement ("CBA"). (*Id.* ¶ 3.). Like all other Ramp Agent Supervisors, Saxon is a non-union employee of Southwest, and is not subject to a CBA. (*Id.* at ¶ 4.) The ADR Program also provides for arbitration "to the fullest extent permitted" by the FAA. (*Id.,* Ex. 1, p. 5.)

In addition, Southwest's ADR Program contains an express "Waiver of Class/Collective Actions" section that states: "There shall be no right or authority for any dispute whatsoever that in any way relates to a Covered Claim to be brought, heard or arbitrated as a class, collective or representative action, or for Southwest Airlines or an ADR Employee to participate as a class member in any purported class, collective or representative action that in any way relates to a Covered Claim." (*Id.* at ¶ 3, Ex. 1, pp. 7-8.) By acknowledging and agreeing to the ADR Program, Saxon is prohibited from filing or joining "any judicial action or Arbitration that is brought on a class, collective, representative, or aggregate basis that in any way relates to a Covered Claim." (*Id.* at ¶ 3, Ex. 1, p. 7.)

## ARGUMENT

**A.     The FAA Requires Arbitration of Saxon's Claims.**

The FAA, enacted in 1925, manifests a long-standing "liberal federal policy favoring arbitration agreements." *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612, 1621 (2018) (citation omitted). The FAA places the enforceability of such agreements on the same footing as other

3

contracts, and requires courts to "rigorously enforce" them. *Id.*; *see also Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24 (1991). Where an arbitration agreement exists, any doubts concerning the arbitrability of a claim must be resolved in favor of arbitration. *Moses H Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). "Accordingly, the standard for compelling arbitration is low." *Mark v. Portfolio Recovery Assoc., LLC*, 2015 WL 1910527, at *2 (N.D. Ill. Apr. 27, 2015) (Dow, J.). Indeed, this Court has explained that a party seeking to compel arbitration need only show an agreement to arbitrate, a dispute within the scope of the arbitration agreement, and the opposing party's refusal to arbitrate. *Id.*

The FAA provides for courts to stay proceedings that involve claims subject to an arbitration agreement if a party requests a stay, which Southwest has done here. 9 U.S.C. § 3. However, the Seventh Circuit and this Court also permit an outright dismissal of proceedings subject to arbitration based on a Rule 12(b)(3) motion for improper venue. *Grasty v. Colorado Tech. Univ.,* 599 F. App'x 596, 597 (7th Cir. 2015); *Johnson v. W. & S. Life Ins. Co.,* 598 F. App'x 454, 456 (7th Cir. 2015); *see also Thomas v. Fiserv Inv. Serv.*, 2015 WL 1282411, at *3 (N.D. Ill. Mar. 18, 2015) (Dow, J.). Southwest seeks alternatively either dismissal pursuant to Rule 12(b)(3), or a stay under 9 U.S.C. § 3 pending Saxon's individual arbitration.

**1.      Saxon Agreed to Arbitrate Her FLSA Claim.**

Here, the FAA mandates dismissal or a stay of Saxon's FLSA lawsuit because the ADR Program to which she agreed explicitly covers it. Saxon seeks to recover wages she is purportedly owed, including overtime pay, primarily for time she allegedly spent working off the clock before the start of her shifts and during unpaid meal breaks. (Dkt. 1 ¶ 35.) The ADR Program, which Saxon acknowledged in writing during each of the previous four years, requires arbitration of all employment claims, including those related to wages and other compensation,

4

hours worked, and breaks. (Ex. E, Declaration of Vincent Vasquez, Ex. 1, p. 2.) Saxon's FLSA claim is precisely the type of claim for which arbitration is required under the ADR Program.

### 2. Saxon Is Subject to the FAA.

Southwest can only assume that Saxon's FLSA collective action, involving the same claims that were dismissed in favor of individual arbitration in the *Battles* Action (Ex. B), is premised on the erroneous and unfounded assumption that Saxon is not subject to the FAA under Section 1, which provides that "nothing [within the FAA] shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Saxon does not fall within this so-called "Section 1 exemption," because she is not a "railroad employee" or engaged in the transport of goods in interstate commerce, as explained below.

To the extent Saxon relies on the Supreme Court's recent *New Prime* decision to bring this claim in court, rather than in arbitration, such reliance is misplaced. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019). In *New Prime*, the Supreme Court held that the particular plaintiff's status as an independent contractor was not relevant to the fact that he was exempt from individual arbitration under FAA Section 1 as a worker engaged in the transportation of goods in interstate commerce. *Id.* at 539, 543-44. The *New Prime* decision was premised largely upon the parties' agreement that the plaintiff, a truck driver, was a "transportation worker" under FAA Section 1. *See id.* at 539. *New Prime* is wholly inapplicable here because Saxon is not engaged in the transportation of goods in interstate commerce, and thus does not fall under any FAA exemption in Section 1 or otherwise within the FAA. To the contrary, Saxon is bound by the FAA and must seek to address her claims, if at all, in individual arbitration, as her fellow Southwest Ramp Agent Supervisors have done. (Ex. D.)

Relevant case law supports Southwest's position that Saxon must be compelled to arbitrate her claims pursuant to the FAA. The only case analyzing the FAA's application to the passenger airline industry – the industry to which Southwest belongs – held that passenger airline employees are not subject to the FAA Section 1 exemption, because such employees are not transportation workers who move physical goods in commerce. *See JetBlue Airways Corp. v. Stephenson*, 2010 WL 6781684, 932 N.Y.S.2d 761 (Sup. Ct. 2010), *aff'd* 931 N.Y.S.2d 284 (2011) (JetBlue pilots were not exempt from the FAA under Section 1 because they were "passenger" pilots and not "goods" pilots). In determining whether the workers were subject to the FAA Section 1 exemption, *JetBlue* held that the workers must be (1) transportation workers, (2) belonging to a class of workers who **move physical goods in interstate commerce**, and (3) in an industry that **primarily** involves the **actual, physical movement of goods through interstate commerce**. *Id.* at *2. While it was undisputed that the JetBlue pilots were involved in transportation, the court explained that "[t]he inclusion or exclusion of these particular pilots from the FAA turns on the definition of the class of worker to which JetBlue pilots belong and the industry in which they work." *Id.* The court held that the pilots belonged to the "passenger airline pilots" class of workers and worked in the "passenger airlines" industry, because their primary function was transporting passengers—not goods—interstate. *Id.* at *3. The JetBlue pilots differed from, for instance, FedEx pilots whose primary function is to carry cargo interstate—while JetBlue pilots' "primary function" is to carry passengers. *Id.*

Similarly, Saxon and other Southwest Ramp Agent Supervisors are not included within the Section 1 exemption because they do not belong to a class of workers who move physical goods in interstate commerce and do not belong to an industry that primarily involves the actual, physical movement of goods through interstate commerce. Southwest is a passenger airline. In

2018, in public filings with the Securities and Exchange Commission, Southwest reported total passenger revenue of $20.45 billion, and freight revenue of only $175 million. There is "other" revenue of $1.34 billion unrelated to passenger or freight revenue. According to these numbers, passenger revenue comprised over 93% of Southwest's 2018 revenue, while freight revenue comprised only 0.8% of Southwest's 2018 revenue.[1]

The United States Department of Transportation (USDOT) also formally classifies Southwest as a passenger airline.[2] According to the USDOT's Bureau of Transportation Statistics (the "BTS"), Southwest was the first-ranked, or largest, U.S.-based passenger airline in 2018, transporting 159 million passengers. https://transtats.bts.gov/carriers.asp?pn=1 (select "Southwest Airlines"). Southwest is excluded from the USDOT's classification of cargo airlines.[3] Federal Express Corporation ("FedEx") is the largest BTS-ranked cargo airline, and transported zero (0) passengers in 2018.[4]

Southwest's Ramp Agent Supervisors have the primary duty of managing non-supervisory Ramp Agents, who are union-represented and thus subject to collective bargaining agreements. (Ex. F, Declaration of Michelle Jordan, ¶¶ 5, 7.) The primary duty of a union-represented Ramp Agent is to facilitate the transportation of passengers by loading and unloading passenger belongings and guiding planes to gates. (*Id.*) **In 2018 alone, Midway Ramp Agents moved ten (10) times more passenger baggage than cargo.** (Ex. F, ¶ 6). Ramp

---

[1] (https://www.sec.gov/Archives/edgar/data/92380/000009238019000022/luv-12312018x10k.htm, p. 68) (last visited April 8, 2019)The Court may take judicial notice of information made available on government websites. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (noting that the contents of government websites are proper subjects of judicial notice).

[2] https://www.transtats.bts.gov/CarrierList_Passengers.asp?xpage=carriers.asp&flag=NONE (last visited April 3, 2019).

[3] https://www.transtats.bts.gov/CarrierList_AllCargo.asp?xpage=carriers.asp&flag=NONE (last visited April 3, 2019).

[4] https://www.transtats.bts.gov/carriers.asp?pn=1&Sel=C&Carrier=FX&Carrier_Name=Federal ExpressCorporation.

7

Agent Supervisors are restricted from performing these duties. (*Id.* at ¶ 7). Both positions are based at Midway and operate solely at Midway. (*Id.* at ¶¶ 5-7) Thus, there is no possibility that either Saxon, a Ramp Agent Supervisor, or the Ramp Agents overseen by Saxon, are physically moving goods across state lines. Moreover, Ramp Agent Supervisors work for Southwest, an airline that primarily moves passengers, not goods. (*Id.* at ¶ 8; *see supra*, p. 7).

Further, the only case in this District analyzing *New Prime* held that the FAA Section 1 exemption does <u>not</u> apply to employees like Saxon, who do not move goods in interstate commerce. *See Wallace v. Grubhub Holdings, Inc.*, 2019 WL 1399986, at *4 (N.D. Ill. Mar. 28, 2019). *Wallace* held that Grubhub food delivery drivers were not subject to the FAA Section 1 exemption because their duties (unlike those of delivery drivers, postal workers, and truck drivers), did not involve the movement of goods across state lines in the stream of interstate commerce. *See id.*[5] Saxon is even further removed from the FAA Section 1 exemption because, as a Ramp Agent Supervisor, she has limited ability to perform bargaining unit work. (Ex. F, ¶ 7.) She also works in an industry and for a passenger airline focused primarily on the movement of passengers, not goods. (*Id.* ¶ 8, *supra* pp. 6-7). Saxon, like the employees in *Jet Blue* and *Wallace*, is not exempt from the FAA under Section 1.

Because the ADR Program covers Saxon's claim and she is not otherwise exempt from the FAA, her claim must proceed to arbitration under the FAA.

---

[5] *Wallace* rejected the argument that it is inconsistent to hold both that the drivers are not engaged in interstate commerce (and thus not subject to the transportation worker exemption) and that the agreement between the drivers and Grubhub is covered by the FAA, noting: "Nothing in *New Prime* suggests that the Supreme Court altered the well-established difference between the two formulations [between Section 1's exemption and Section 2's limitation of the FAA to contracts related to interstate commerce]. There is nothing illogical about the FAA covering workers who are not 'engaged in interstate commerce' so long as the workers have entered a contract 'involving commerce.'" *Wallace*, 2019 WL 1399986, at *5.

**B.      Saxon Is Bound by A Valid Agreement to Arbitrate Under Illinois Law.**

The FAA mandates that arbitration agreements are to be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. State law governs the interpretation of "generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745-46 (2011). The party seeking to avoid arbitration bears the burden of establishing these "generally applicable contract defenses." *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). "To determine whether a contract's arbitration clause applies to a given dispute, federal courts apply state-law principles of contract formation." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012).

**1.      Saxon Formed a Valid Agreement Under Illinois Law.**

Illinois law applies to Saxon's agreement to arbitrate because it was executed in Illinois, Saxon's claims arose in Illinois, and the ADR Program does not include a contrary choice-of-law provision. *See Show-Me's Franchises, Inc. v. Sullivan*, 2014 WL 7005197, at *4 (S.D. Ill. Dec. 11, 2014); *Sys. Dev. Integration, LLC v. Computer Sci. Corp.*, 739 F. Supp. 2d 1063, 1079-1080 (N.D. Ill. Sept. 13, 2010). Under Illinois law, an enforceable contract requires an offer, acceptance, and consideration. *Plymouth Tube Co. v. Pilepro Steel, LP*, 2017 WL 4707454, at *5 (N.D. Ill. Oct. 19, 2017) (citing *Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738 (Ill. App. 2013)); *Chatman v. Pizza Hut, Inc.*, 2013 WL 2285804, at *3 (N.D. Ill. May 23, 2013).

As to acceptance, signing a document indicates assent to the terms of an agreement. *See Keck and Assoc., P.C. v. Vasey*, 834 N.E.2d 486, 487 (Ill. App. 2005). Under Illinois law, an electronic signature may be used to sign a writing and shall have the same force and effect as a written signature. *See* 5 Ill. Comp. Stat. Ann. 70/1.15; *Scroggins v. Uber Techs*, 2017 Dist.

Lexis 10815 (Jan. 26, 2017) (finding acceptance of arbitration agreement by employee's electronic confirmation through the employer's digital portal).

Concerning consideration, "[a]ny act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." *Chatman*, 2013 WL 2285804, at *4. Specifically, mutually binding promises to arbitrate constitute valid consideration for both parties, and give rise to enforceable arbitration agreements. *Id.* (an employer's "mutual promise to arbitrate is sufficient consideration to support the arbitration agreement").

Here, Saxon formed a valid agreement under Illinois law. Southwest offered to continue Saxon's employment and resolve its claims against Saxon through arbitration in exchange for her promise to do the same with legal claims against Southwest. (Ex. E, Declaration of Vincent Vasquez, at Ex. 1, pp. 1-3.) Saxon accepted the offer by electronically agreeing to the ADR Program on October 15, 2018. (*Id.*, Ex. 2.) The ADR Program also covers the essential terms in detail, specifying the applicable rules governing the arbitration process, the claims covered, and the rights retained by the parties. (*Id.*, Ex. 1, pp. 4-8.) Southwest's ADR Program further provides that it is entitled to reimbursement of its fees incurred in enforcing the ADR Program. (Ex E, Ex. 1, p. 7 thereto).

      **2.      Saxon's FLSA Claim Falls Within the Scope of Her Agreement.**

As explained above, the plain language of the ADR Program covers Saxon's FLSA claim. The ADR Program requires Saxon to arbitrate any claims arising between herself and Southwest relating to her employment, specifically including claims concerning wages, hours worked, and breaks. (*Id.* at ¶ 3, Ex. 1, p. 2.) Because Saxon sued under the FLSA to recover alleged unpaid wages, her claims fall squarely within the scope of the ADR Program and must be arbitrated pursuant to her agreement to the ADR Program.

C. **The Supreme Court's *Epic Systems* Decision Requires Dismissal of Saxon's Claim.**

The United States Supreme Court recently held that arbitration agreements like Southwest's ADR Program, which requires employees to arbitrate employment-related claims on an individual basis, are valid and enforceable and preclude plaintiffs from participating in class or collective actions such as this one. *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612 (2018). Specifically, the Supreme Court confirmed: "In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—**including terms providing for individualized proceedings**." *Id.* at 1619 (emphasis added). Because the ADR Program prohibits Saxon from engaging in representative proceedings, her collective action against Southwest must be dismissed.

## CONCLUSION

Saxon agreed to arbitrate her FLSA claim against Southwest on an individual basis. The Court should dismiss this lawsuit for improper venue pursuant to Federal Rule 12(b)(3), or alternatively, stay this lawsuit under the Federal Arbitration Act, 9 U.S.C. § 3, pending individual arbitration of Saxon's claims. Southwest further requests an award of its fees incurred in enforcing its ADR Program.

Dated: April 8, 2019

Respectfully submitted,

SOUTHWEST AIRLINES CO.

By: /s/ *Melissa A. Siebert*
One of Southwest Airline Co's. Attorneys

Melissa A. Siebert
SHOOK, HARDY & BACON LLP
111 S. Wacker Drive, 51st Floor
Chicago, Illinois 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
masiebert@shb.com

11

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 8, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

                                       /s/ *Melissa A. Siebert*
                                       *One of the Attorneys for Defendant*
                                       *Southwest Airlines Co.*