IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LATRICE SAXON, individually and on )
behalf of others similarly situated, )
) Case No. 19-cv-0403
Plaintiff, )
) Judge Robert M. Dow, Jr.
v. )
)
SOUTHWEST AIRLINES CO., )
)
Defendant.

MEMORANDUM OPINION AND ORDER

Plaintiff Latrice Saxon brings a putative collection action brought pursuant to the Fair Labor Standards Act. Before the Court is Defendant Southwest Airline's motion to dismiss for improper venue, arguing that Plaintiff's case must be arbitrated. [13]; see also [27]. For the reasons set forth below, Defendant's motion to dismiss is granted and this civil case is terminated.

I. Background

This case arises out of a putative collective action brought pursuant to the Fair Labor Standards Act, 29 U.S.C. §201 *et seq*. Before the case can proceed to the merits, however, the Court must first determine the threshold issue of whether the case must be dismissed in favor of arbitration. Both the details of Plaintiff's job responsibilities and the procedural history are provided for context.

A. Job Duties

Plaintiff Latrice Saxon is a "non-exempt ramp supervisor" for Defendant Southwest Airlines at Midway International Airport. [1, ¶¶8, 10.][1] The listed duties of Ramp Supervisors

---

[1] Through the briefing and attached materials, the position is referred to as "Ramp Supervisor," "Ramp Agent Supervisor," and various permutations thereof. The Court infers that these are all the same position of "Ramp Supervisor."

include (but are not limited to): assigning subordinate "Ramp Personnel" to various tasks and monitoring their work flow; training "Ramp Agents;" and "determin[ing] that aircraft are properly serviced and provisioned prior to departure." [27-2 at 2.] The Ramp Supervisor position also requires that supervisors "be able to lift and move items of 70 pounds and/or more on a regular basis and repetitively lift weights of 40 to 50 pounds on raised surfaces." [27-2 at 3.]

Ramp Supervisors, such as Plaintiff, "are restricted from performing Ramp Agent duties because of the collective bargaining agreement ("CBA") between [Defendant] and Transportation Workers Union [] Local 555." [27-1, ¶5.] Ramp Agents' primary duties include loading and unloading baggage and guiding planes to gates. *Id*. The restriction on Supervisors' ability to perform Agent tasks is not, however, absolute. Supervisors are tasked with overseeing Ramp Agents and "may continue to perform covered work [*e.g.*, loading baggage] while on duty, with the understanding that the intent is for a supervisor to assist, direct, train, evaluate agent performance and support the operation by managing and directing the workforce." [27-1 at 3.] Moreover, although Ramp Supervisors may not preempt Agents for shifts, Agents may give their shifts to Ramp Supervisors in certain circumstances. [*Id*.] Thus, though Ramp Supervisors' ability to perform Agents' tasks (most importantly handling baggage) is "restricted," [27-1, ¶ 5], this restriction is not a complete bar.

In fact, Plaintiff alleges that she regularly "fill[s] in for Ramp Agents at least three out of the five days each week" that she works. When she "step[s] into the shoes of the Ramp Agents," Plaintiff "perform[s] the Ramp Agents' duties of loading and unloading the goods and cargo from Southwest planes."[2] Plaintiff further explained that in addition to passengers' personal luggage,

---

[2] Defendant contends that "Ramp Agent Supervisors" are restricted from performing Ramp Agent duties. [27 at 6.] As explained above, however, this restriction is not absolute, and according to Defendant's own documentation, Supervisors may perform Ramp Agent duties in limited circumstances. To the extent that there is a factual dispute as to whether Plaintiff has handled luggage and freight in her role as Ramp

2

Southwest ships (and she has handled) other freight. [*Id*, ¶ 6–7.] Defendant concedes that it ships freight but argues that most of the goods shipped in its planes' cargo holds are passenger luggage. [27-1, ¶ 6 ("[T]he ratio of passenger baggage to freight cargo at Midway was 10:1. This means that Midway Ramp Agents handled ten (10) times more baggage than they handled freight in 2018").] In addition to customer baggage and air freight, Defendant also apparently ships "air mail, ballast, and Company materials." [27-1 at 13.] The Court infers that when Supervisors "step into the shoes" of Agents, they also load and unload this cargo, see [28-1, ¶¶ 3–5], but neither side has offered any evidence or assertion as to what proportion of cargo is comprised of these items.

There is one further important difference between Ramp Agents and Ramp Supervisors—the former are included in a CBA; the latter are not. [27-2 at 10, 13.] Thus, according to the terms of Plaintiff's employment, she must individually arbitrate in cases such as this through a process of Alternative Dispute Resolution (ADR). See generally [14-5].

### B. Procedural History

Plaintiff filed a putative collective action lawsuit against Defendant, alleging a violation of the FLSA for failure to pay overtime wages. [1, ¶¶ 28–45.] Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue or in the alternative to stay proceedings pursuant to 9 U.S.C. § 3. See generally [14]. Defendants alleged that Plaintiff had signed a binding arbitration agreement, valid under Illinois law, that required her to individually arbitrate all wage and hour related claims against Defendant. [*Id*.] Because this suit was within the scope of that ADR

---

Supervisor, for purposes of this motion the Court assumes that she has done so. Her affidavit is uncontradicted, and the materials that Defendant has attached to their supplemental briefing show that Ramp Supervisors may perform Ramp Agent duties (albeit in limited circumstances). Moreover, the job description for Ramp Supervisor requires that employees be able to, for example, "repetitively lift weights of 40 to 50 pounds on raised surfaces." This requirement would be inexplicable and superfluous if Ramp Supervisors did not have to "step into the shoes" of Agents and load and unload cargo.

Agreement, they argue, she must submit to arbitration. See [*id*]; see also generally [14-5 (providing documentation of Plaintiff's submission to ADR Agreement)].

Plaintiff conceded that she signed the ADR Agreement, and that if the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, applies to her, ADR would be the proper venue for this suit. See [25-1 at 2]. Therefore, the only threshold issue is whether she is exempt from the FAA under § 1. [*Id.*]. The Court authorized limited discovery into Plaintiff's job duties for the sole purpose of determining whether this Court is the proper venue for the FLSA action. [25-1, 7]; [26].

**II.     Legal Standard**

A motion seeking dismissal pursuant to an arbitration agreement is best "conceptualized as an objection to venue, and hence properly raised under 12(b)(3) * * *." *Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007). The Seventh Circuit has instructed that all facts be construed and all reasonable inferences be drawn in favor of the plaintiff. *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 806 (7th Cir. 2011); see also *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 773 (7th Cir. 2014). In contrast to the familiar Rule 12(b)(6) motion, "[w]hen ruling on a motion to dismiss for improper venue, the district court is not obligated to limit its consideration to the pleadings [or to] convert the motion to one for summary judgment if the parties submit evidence outside the pleadings." *Faulkenberg*, 637 F.3d at 809–10 (7th Cir. 2011). "The party opposing arbitration has the burden of establishing why the arbitration provision should not be enforced." *Wallace v. Grubhub Holdings Inc.*, 2019 WL 1399986, *2 (N.D. Ill. Mar. 28, 2019) (citing *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000)).

## III. Discussion

Preliminarily, the Supreme Court has explained time and again that the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.*, "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); accord, *e.g.*, *American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 243–44 (2013) ("[The FAA] reflects a federal policy favoring actual arbitration * * *."); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration."); *Circuit City*, 532 U.S. at 123 ("Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation."); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) ("[I]t should be kept in mind that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.") (quotation marks and citation omitted); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (noting "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts"). Thus, absent a clear statutory exception to the arbitrability of Plaintiff's claim, the Court must "respect and enforce agreements to arbitrate[.]" See *Epic Systems*, 138 S. Ct. at 1621.

Section 2 of the FAA defines the class of arbitrable cases; it provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

The Supreme Court has held that employment contracts are contracts "evidencing a transaction involving commerce." *Circuit City*, 532 U.S. at 113 (discussing *Gilmer*, 500 U.S. 20). Thus, Plaintiff's signed arbitration agreement is "valid, irrevocable, and enforceable" under § 2 unless an exception applies.

Plaintiff argues the signed arbitration agreement is unenforceable because she falls under an exception in § 1 of the FAA.[3] In relevant part, § 1 reads: "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Otherwise valid agreements to arbitrate cannot be enforced if part of a contract of employment with an enumerated worker. See *New Prime*, 139 S. Ct. at 539. Plaintiff acknowledges that she is neither a seafarer nor railroad employee but argues that she is "engaged in foreign or interstate commerce." See 9 U.S.C. § 1. In support, she points to her handling of baggage, freight, and other goods shipped interstate; her supervision of these shipments; and the fact that Defendant is an airline. Defendant counters that it is not, in fact, a transportation company; Plaintiff never personally transports goods interstate; and exceptions to the FAA should be applied narrowly.

Notwithstanding the broad language in the residual clause to § 1 of the FAA, the Supreme Court has adopted a narrow construction of "engaged in foreign or interstate commerce." *Circuit City*, 532 U.S. at 109. It arrived at this conclusion by employing the *ejusdem generis* canon of statutory construction, which instructs that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id*. at 115–16 (quotation marks and

---

[3] The parties do not dispute, and the Court need not address, the question of arbitrability of arbitrability. As the Supreme Court recently held, "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

citations omitted).  Because "engaged in interstate commerce" is preceded by references to specific occupations within the transportation industry, the Court reasoned that "Section 1 exempts from the FAA only contracts of employment of transportation workers." *Id*. at 119.  The Supreme Court further elaborated that "transportation workers" could be "defined, for instance, as those workers 'actually engaged in the movement of goods in interstate commerce.' *Id*. at 112 (quoting *Cole v. Burns Intern. Sec. Services*, 105 F.3d 1465, 1471 (D.C. Cir 1997) (collecting cases)); see also *id*. at 134–35 (Souter, J., dissenting) ("A majority of this court now puts its *imprimatur* on the majority view among the Courts of Appeals."); *International Broth. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 956 (7th Cir. 2012) (employing the Supreme Court's illustrative definition); but see *Singh v. Uber Technologies Inc.*, ___ F.3d ___, 2019 WL 4282185 at *9 (3d Cir. Sept. 11, 2019) (describing this definition as illustrative dicta).  Although the Supreme Court recently interpreted the § 1 exemption, it did not have occasion to clarify the definition of "transportation worker." See *New Prime*, 139 S. Ct. at 539.

As one court has observed, "[i]n the 18 years since the Supreme Court decided *Circuit City*, state and federal courts have grappled with these unresolved issues, but 'little consensus has been realized.'" *Muller v. Roy Miller Freight Lines, LLC*, 246 Cal.Rptr.3d 748, 753–757 (Cal. Ct. App. 2019) (collecting cases and quoting *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477,482 (S.D.N.Y. 2008)).  However, the cases examining the definition of "transportation worker" have identified several rules-of-thumb to guide decision-making.  Although the case at bar defies easy categorization, these rules-of-thumb illuminate the outer bounds of the term "transportation workers."

"If there is one area of clear common ground among the federal courts to address this question, it is that truck drivers—that is, drivers actually involved in the interstate transportation

7

of physical goods—have been found to be 'transportation workers' for purposes of the residuary exemption in Section 1 of the FAA." *Kowalewski*, 590 F. Supp. 2d at 483 (collecting cases). The Seventh Circuit recently confirmed this consensus, even as applied in a borderline case. See *Kienstra*, 702 F.3d at 957. In *Kienstra*, the plaintiffs worked at a cement company, not a trucking company, and, when they did deliver goods, they did so almost exclusively intrastate. *Id*. But, because the truckers made "a few dozen" interstate trips out of "1500 to 1750 delivers each year" they were interstate transportation workers for the purposes of § 1 of the FAA. *Id*. at 958; but see *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289–90 (11th Cir. 2005) (explaining that an accounts manager who made incidental deliveries across state lines is no more a transportation worker than "a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town").[4] Here, Plaintiff does not assert in the complaint that she personally transported goods across state lines, so she does not automatically qualify as a transportation worker under *Kienstra*.

There is also a broad consensus that drivers who make intrastate deliveries of locally produced goods are exempt from the FAA. In other words, pizza-delivery drivers and the like are not transportation workers because no part of their work touches interstate commerce. *E.g.*,

---

[4] Defendant argues that one component of the test for "transportation worker" under *Circuit City* includes whether the worker is employed "in an industry that *primarily* involves the actual, physical movement of goods through interstate commerce." [27 at 1 (citing *JetBlue Airways Corp. v. Stephenson*, 2010 WL 6781684, *2 (N.Y. Sup. Ct. Nov. 22, 2010) (emphasis in original).] Defendant further contends, again relying on *JetBlue*, that passenger airlines that also carry cargo, such as Defendant, are solely in the "passenger airline industry." [27 at 2 (citing *JetBlue*, 2010 WL 6781684 at *2).] In other words, *JetBlue* discounted the fact that JetBlue Airlines shipped a small amount of freight and concluded that transporting passengers is not commerce. *JetBlue*, 2010 WL 6781684 at *3. Preliminarily, the New York State trial court's unpublished opinion is hardly the only word on the matter. See, *e.g.*, *Singh*, 2019 WL 4282185 at *7–12 (explaining that Uber drivers may be "transportation workers" within § 1 of the FAA); *id*. at *15–16 (Porter, J., concurring) (stressing that there is no "goods-passengers distinction" in § 1 of the FAA). But even if the Court found *JetBlue*'s reasoning persuasive, however, the Court is bound by the Seventh Circuit's holding in *Kienstra*. Although the workers in *Kienstra* were primarily employed in the cement industry, the Seventh Circuit still found them to be transportation workers. Likewise, the Seventh Circuit found that infrequent interstate deliveries of goods were enough to trigger the exception in § 1, contradicting *JetBlue*'s reasoning regarding the proportion of activity directed toward interstate commerce.

*Wallace v. Grubhub Holdings Inc.*, 2019 WL 1399986, *3 (N.D. Ill. March 28, 2019) (drivers who deliver prepared meals from restaurants intrastate are not transportation workers); *Lee v. Postmates Inc.*, 2018 WL 6605659, *7 (N.D. Cal. Dec. 17, 2018) (same); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899–900 (N.D. Cal. 2018) (same); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152–54 (N.D. Cal 2015) (same). These cases are also inapplicable to the instant dispute, for Plaintiff *does* handle at least some goods that are in interstate commerce. For example, the Ramp Supervisors at Midway airport handle air freight for interstate shipment. [28-1, ¶¶ 4–6] ; see also [27-1 at 13].

Finally, merely working in a transportation-*adjacent* industry or position—without transporting or handling goods or directing those who do—is not enough to qualify any employee as a transportation worker. For example, in *Borgonia v. G2 Secure Staff*, the plaintiff worked as a contractor at San Francisco International Airport performing the following duties: "security screener, wheelchair agent, and dispatcher." 2019 WL 1865927, *1 (N.D. Cal. Apr. 25, 2019). The plaintiff was not deemed to be a transportation worker because he did not handle goods in interstate commerce or transport anything. *Id*. at *4. Some courts have found an exception to this rule where the worker in question personally directs transportation workers engaged in interstate travel. Compare *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 353 (8th Cir. 2005) (concluding that a customer service representative for trucking company was not a transportation worker after considering multifactor balancing test); *Lorntzen v. Swift Transp., Inc.*, 316 F. Supp. 2d 1093, 1096–97 (D. Kansas 2004) (explaining that a "Safety Compliance Assistant" for a trucking company is not a transportation worker); *Cole v. Burns Intern. Sec. Services*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (holding that a security guard at an train hub was not a transportation worker), with *Zamora v. Swift Transp. Corp.*, 2008 WL 2369769, *7–9 (reasoning that a manager who

personally monitors and directs interstate truckers is a transportation worker); *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593–94 (3d Cir. 2003) (same). Here, Plaintiff does not merely work alongside those who touch interstate commerce—she handles goods herself. Plaintiff's role as a supervisor is discussed below.

In contrast to the aforementioned fact patterns, the courts are split about two classes of workers who handle goods that have traveled interstate, but whose scope of work is entirely intrastate. The first scenario concerns drivers who make intrastate deliveries of goods that have been shipped from out of state. Although most of the courts to consider these "last-mile" delivery arrangements conclude that intrastate delivery people to be transportation workers, some cases hold otherwise. Compare, *e.g.*, *Waithaka v. Amazon.com, Inc.*, ___F. Supp. 3d___, 2019 WL 3938053, *4 (D. Mass. Aug. 20, 2019) (holding that "last-mile" delivery drivers for Amazon are transportation workers); *Rittman v. Amazon.com, Inc.*, 383 F.Supp.3d 1196, 1201–02 (W.D. Wash. 2019) (same); *Muller v. Roy Miller Freight Lines, LLC*, 246 Cal.Rptr.3d 748, 758–59 (Cal. App. Ct. 2019) (holding that driver who made intrastate deliveries of goods that originated almost exclusively out of state is a transportation worker); *Nieto v. Fresno Beverage Co., Inc.*, 245 Cal.Rptr.3d 69, 76–77 (Cal. App. Ct. 2019) (same); *Ward v. Express Messenger Systems, Inc.*, No. 17-cv-2005-NYW, *10–11 (D. Colo. Jan. 28, 2019) (order denying motion to compel arbitration) (explaining that intrastate deliveries of material shipped interstate by Amazon, Staples and various pharmaceutical companies qualified as interstate commerce); *Diaz v. Michigan Logistics*, 167 F.Supp.3d 375, 380 n.3 (E.D.N.Y. 2016) (opining in dicta that "Plaintiffs sufficiently allege that they were engaged in interstate transportation, notwithstanding that they did not actually drive across state lines, as Plaintiffs were directly responsible for transporting and handling automotive parts that allegedly moved in interstate commerce—the heart of Defendants' business."); *Christie*

*v. Loomis Armored US, Inc.*, 2011 WL 6152979, *3 (holding that driver who makes intrastate deliveries of currency is a transportation worker), with *Bonner v. Michigan Logistics Incorporated*, 250 F.Supp.3d 388, 397 (D. Ariz. 2017) (assuming that deliveries must cross state lines); *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, *4–5 (N.D. Cal. Mar. 14, 2016) (discussing *Kienstra* and concluding that a driver who makes intrastate deliveries of lost or delayed airline luggage is not a transportation worker).[5] Unlike these cases, in which the workers all indisputably *transported* goods, here Plaintiff does not herself transport anything.

The next scenario—and the one that is most relevant here—concerns workers who load and unload packages in a central hub. The courts to have considered these scenarios have reached split decisions. The Sixth and Eleventh Circuits have concluded that postal workers as a class fall within the FAA's exemption for workers engaged in interstate commerce, seemingly regardless of whether the workers in question transport (as opposed to merely handle) mail. But both of these cases predate *Circuit City* and neither case uses the "transportation worker" framework. *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988) ("If any class of workers is engaged in interstate commerce, it is postal workers."); *American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 823 F.2d 466, 473 (11th Cir. 1987) ("It seems to us that, if any workers are actually engaged in interstate commerce, the instant postal workers are.") (internal quotations

---

[5] In *Muller*, the California Court of Appeal attempted to harmonize these holdings by explaining that there is a difference between "truckers," "whose primary purpose is to continue the flow of interstate commerce by transporting out-of-state freight and cargo," and "delivery" drivers, who have a solely local focus. *Muller*, 246 Cal. Rptr. 3d. at 758. Other courts have distinguished *Vargas* by noting that "luggage, however, 'was not a 'good' to be delivered until it was delayed or lost by the airline and then discovered when it was already intrastate. Much like a food delivery service, a luggage delivery service is not engaged in interstate commerce because it is not in the business of shipping goods across state lines, even though it delivers good that once travelled interstate." *Waithaka*, 2019 WL 3938053 at *3 (quoting *Rittman*, 383 F. Supp. 3d at 1200). In other words, *Vargas* looks more like *Borgonia* or *Grubhub* than an interconnected interstate delivery service. And *Bonner*'s factual analysis is so bare bones that it is difficult to discern whether the drivers are better categorized as drivers delivering locally produced goods or part of a chain or interstate truckers. See *Bonner*, 250 F. Supp. 3d at 397. Regardless, because Plaintiff is not a last-mile driver, the Court need not delve too deeply into each of these outliers.

11

and citation omitted). More recent decisions, however, generally have concluded that workers who handle goods shipped in interstate commerce—but do not transport goods themselves—are *not* exempt from the FAA under § 1. *Furlough v. Capstone Logistics, LLC*, 2019 WL 2076723, *7 (N.D. Cal. May 10, 2019) (holding that warehouseman whose job duties included "loading, unloading, and handling freight; communicating with drivers; and monitoring conditions on the docks" was not a transportation worker); *Kropfelder v. Snap-On Tools Corp.*, 859 F. Supp. 952, 958–59 (D. Md. 1994) (concluding that warehousemen who load and unload trucks used to deliver goods in interstate commerce are not transportation workers).[6]

Taken together, these two lines of cases suggest that the linchpin for classification as a "transportation worker" under *Circuit City* is actual transportation, not merely handling goods. That is, workers who transport goods intrastate as part of an interstate Pony-Express style network may be transportation workers, but those who merely handle those goods at one end or the other are not. Moreover, the distinction between transporting goods and merely handling them is borne out by the other categories of exempt workers enumerated in § 1. For example, though seamen's contracts of employment are exempt from the FAA, grounds crew such as longshoremen are not considered seamen. *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 348 (1991) ("Whether under the Jones Act or general maritime law, seamen do not include land-based workers[]" such as stevedores and longshoremen.); see also *Brown v. Nabors Offshore Corp.*, 339 F.3d 391, 393, 395 (5th Cir. 2003) (holding that the definition of "seaman" in the Jones Act should be used to determine § 1 exemptions from the FAA); see also *Veliz*, 2004 WL 2452851, at *4 (explaining that the legal definitions of seamen and railroad employees require, respectively, an "employment-related connection to a vessel *in navigation*" or "*navigation* of a vessel, *i.e.*, transportation")

---

[6] Another possible explanation for the divergent holdings is simply that postal work is *sui generis*. See *Lorntzen*, 316 F. Supp. 2d at 1097 (distinguishing postal cases from *Kropfelder*).

12

(quotation marks and citation omitted) (emphasis added). In other words, courts have begun to materially distinguish between nonexempt workers who handle goods in service of transportation (warehousemen, stevedores, and porters) and exempt workers who actually transport them by navigating the channels of interstate commerce (truckers, seamen, and railroadsmen, respectively).

The case at bar is virtually indistinguishable from the cases holding that merely loading and unloading goods is not "transportation" work. Here, Plaintiff's job duties at most include loading and unloading some cargo from Defendant's planes, along with supervising that task. The case is thus identical to *Furlough* and *Kropfelder*, both of which concluded that warehouse managers who loaded and unloaded cargo and generally managed warehouse logistics were not transportation workers. As in those cases, Plaintiff herself does not transport cargo at all (even intrastate) and is therefore not a transportation worker. Accordingly, the FAA does not exempt Plaintiff and she therefore must arbitrate her claim.

This conclusion is informed by three additional factors. First, as explained above, the Seventh Circuit places great weight on whether the worker in question actually transported goods across state lines. *Kienstra*, 702 F.3d at 957–58. The procedural history of *Kienstra* further underscores the importance of interstate travel. When the case originally reached the Seventh Circuit, it was unclear whether the truckers had crossed state lines. *Id.* at 956. Because the panel felt that it might lack jurisdiction on that basis, it issued a limited remand to determine whether the truckers did, in fact, transport goods interstate. *Id*. at 955–956. Here, the record is clear that Plaintiff did not physically transport goods at all, let alone out-of-state.

Second, the trend in the case law reflects a growing consensus that handlers are not transportation workers. As explained above, the two cases going the opposite direction both failed to use the "transportation worker" framework, and their holdings have been called into doubt.

13

*Bacashihua*, 859 F.2d at 405; *American Postal*, 823 F.2d at 473; see also *Veliz*, 2004 WL 2452851, *6 ("[I]t is unclear to what degree these cases remain good law."); *cf.* also *Rittman*, 383 F. Supp. 3d at 1201 n.4 (suggesting that after *Circuit City*, the postal cases are most applicable to postal workers who personally transport packages).

Finally, the Court is mindful of the "liberal federal policy favoring arbitration agreements." *Epic Systems*, 138 S.Ct. at 1621 (quotation marks and citation omitted). As far back as 1983, the Supreme Court explained that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25. Since then, the Supreme Court has reiterated the importance of respecting valid arbitration agreements, particularly in the employment context. *Epic Systems*, 138 S. Ct. at 1621; *Circuit City*, 532 U.S. at 123.

The Court is unconvinced by Plaintiff's arguments to the contrary. First, Plaintiff points to the non-exhaustive eight-factor test applied by the Eighth Circuit in *Lenz*, arguing that these factors show that Plaintiff is a transportation worker. [28 at 3–8 (discussing *Lenz*, 431 F.3d at 352).] But the Seventh Circuit has not adopted this test and other courts have noted that these eight factors were tailored to the facts in *Lenz* and have limited applicability in other contexts. See *Kowalewski*, 590 F. Supp. 2d at 482 n.3; *cf. Singh*, 2019 WL 4282185 at *10 n.8. Moreover, although many of these factors have informed the Court's decision-making, *Lenz* provides no framework for how to weigh each factor and little guidance regarding application. In fact, the *Lenz* court considered the physical transportation of goods to be of paramount importance and applied its factors with that in mind.[7] *Lenz*, 431 F.3d at 352–53.

---

[7] For example, the first *Lenz* factor is "whether the employee works in the transportation industry." *Id*. at 352. While the employee in *Lenz* clearly worked in the transportation industry for a trucking company, the Eight Circuit held this factor against him because "he never directly transported goods in interstate commerce." *Id*. So too here—even granting that Plaintiff worked in the transportation industry, she has

14

Next, Plaintiffs quote half of another court's summary of *Kienstra* (until the word "but") to suggest that the Seventh Circuit is indifferent to interstate transportation when determining whether someone is a transportation worker. [28 at 12 (quoting *Wallace*, 2019 WL 1399986, *3).] As explained above, however, the holding, reasoning, and procedural history of *Kienstra* strongly suggest that, at the very least, whether a worker crossed state lines is a very important factor. See *Vargas*, 2016 WL 946112, at *4. And there is nothing in *Kienstra* suggesting that workers who do not transport anything are "transportation workers."

Likewise, Plaintiff does not fall under an exception for managers recognized by the Third Circuit. See *Palcko*, 372 F.3d 592–93; see also *Zamora*, 2008 WL 2369769 at *8–9 (discussing *Palcko*). The plaintiff in *Palcko* was a manager who supervised and directed truckers who delivered goods interstate. *Id*. at 590. She did not, however, handle goods or travel interstate herself. *Id*. at 593. The Third Circuit reasoned that because the manager directly manipulated the channels of interstate commerce, she was a transportation worker under § 1 of the FAA. *Id*. at 593–594.[8] Although Ramp Supervisors (such as Plaintiff) supervise employees, they do not direct the interstate shipment of goods or manipulate the channels of commerce themselves (by, for example, directing specific pilots to fly specific routes with specific goods in tow) and therefore are not transportation workers under this exception. See generally [27-2]. Moreover, *Palcko* explicitly limited its holding to exclude warehouse managers who load and unload goods; as

---

"never directly transported goods in interstate commerce," so this factor weighs against her. Contra [28 at 1].

[8] The case in *Zamora* is quite similar, insofar as the manager was found to be a transportation worker because she monitored truckers' routes, mileage, and cargo, and directed their movements. *Zamora*, 2008 WL 2369769 at *1. *Zamora* is further distinguishable from this case because the manager at issue occasionally drove for the employer. *Id*. at *7. Under *Kienstra*, that may be enough, on its own, to qualify the manager as a transportation worker.

explained above, such warehouse employees are virtually indistinguishable from the Ramp Supervisors in the instant case. *Palcko*, 372 F.3d at 594 n.2 (distinguishing *Kropfelder*).

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss [13] is granted, and Plaintiff's claims must be arbitrated. Civil case terminated.

Dated: October 8, 2019

                                                Robert M. Dow, Jr.
                                                United States District Judge